Case number 23-1472, National Labor Relations Board v. Metro Man IV LLC Arguments not to exceed 15 minutes per side. Mr. Pecor, you may proceed for the respondent. My apologies, your honor. It took me a little bit to get my bag unpacked. First, thank you for taking the time to hear this case. Just a procedural note, I have reserved three minutes for rebuttal. Request the standard warnings. We're here because courts have historically given deference to agencies like the National Labor Relations Board. This case is frankly a good case of why that deference is under review in many levels. In fact, the Supreme Court has two cases pending right now reconsidering Chevron deference. Well, I should go without saying federal agencies are subject to rules just like courts. Just like a court cannot make rules without following proper procedures or rulings without following proper procedures, federal agencies are subject to those same rules. It's because of these rules that I'm here today. In particular, there is a reason the board has to petition this court for enforcement of its orders. This court is not merely a rubber stamp. This court requires the board present orders based on substantial evidence and subjects their orders to special scrutiny when they fail to follow their own precedent. Unfortunately, this case involves both of those factors. When we look at the briefs and we listen to arguments today, I think the lack of citation to evidence on the behalf of the board to support some of the assumptions and decisions... You mentioned, I was going to ask about, so the court does have a case about overruling Chevron. Even if it overruled Chevron though, I think you only presented pretty fact-specific issues, like substantial evidence issues. Correct me if I'm wrong, but the question about whether Chevron... No, Chevron actually is not even specific to the National Labor Relations Board. My point more is that the deference courts historically pay federal agencies. I can't imagine the court saying anything about factual findings being not given deference. This case actually involves more than factual findings, Your Honor. For instance, when we talk about how the board did not follow their special circumstances rulings with regard to the excusal of collective bargaining obligations, or the timing in which those discussions occurred. I'd really like to start by probably, I think, focusing on a factual issue, as you point out, and why this order is so problematic. I think the most glaring area of this order, when it comes down to the issue of this $2 an hour hazard pay, the incentive reflected in the pay records that is the General Counsel's exhibit. And, you know, based on the board's ruling, the board basically rules that to create a secondary violation, that this termination of the hazard pay, when the hazard actually went away, was an independent act, an independent decision. Doesn't that argument just assume the conclusion? Because I thought the factual dispute about whether it was a temporary payment with a discrete end date, or a temporary payment that was going to be open for a discretionary period. And the board found the latter as a factual matter, and we're just here on whether there's enough evidence to support that it was open-ended with the employer's discretion. The board held that, yes, the employer reserved discretion and made an independent decision to end the hazard pay. Why isn't the fact that the notice said, until further notice? Well, I think the notice has to be put out and recognized. Luckily, we all did at the beginning of COVID. Now, this case is weeks into the pandemic, and nobody knew when it was coming. I mean, at the time, we were discussing the possibility of vaccines, but it was never, it was years away at that time. And so no one knew how long it was going to take to get the COVID patients out of the building. The point of that notice was that this was not a permanent benefit. This was always intended to be a temporary benefit tied to the existence of the pandemic. And even, you know, the board rules on the, basically insinuates that Servi made an independent decision, but if you look at Servi's actual testimony, she didn't make an independent decision. She, the only, in fact, the only people mentioning her making a decision were the people asking her a question. She repeatedly, repeatedly cited back to, she was merely following the instructions of Mr. Dunn when he originally announced this benefit. You know, if you look at whether or not something, there's a lot of instances where you can name a date, but there are circumstances like this where simply people don't know. It was clear that this entire benefit was tied to COVID. Why shouldn't the rule for this type of case, where there is somewhat of an unclear endpoint, why shouldn't the rule be, yeah, we recognize that the beginning point, no chance to bargain, but since the endpoint was unclear, there should be a duty to give notice to the union and potentially get their input on when this unknown endpoint should come to a close. And I think the question is, is there evidence to say that endpoint was unclear? And the overwhelming evidence in this record confirmed everybody in that building knew. Every single witness who testified on this issue confirmed that it would end when COVID left the building. They had no more COVID positive patients in the building. And that was the endpoint. It did have a specific endpoint, just nobody knew that that endpoint was going to prove to be June 16th. But if that's true, then why didn't it come, why didn't you bring it up? Didn't you guys, you guys negotiated sometime in June, right? Correct. And it didn't come up then? Well, let's just say there is testimony that was not credited on that issue. I will say hazard pay, the union undisputedly brought a proposal on hazard pay. Every single member of the union's bargaining team was receiving the pay at the time. In fact, that very day on June 10th, they had received checks that included that payment. So I would argue that the evidence did not support the credibility determination that said that it wasn't discussed that day. But there was ample evidence, I believe, available to support the assertion that it was within the union's knowledge or that they at least should have known since the majority of bargaining team knew. In fact, the same evidence the board relies upon to prove knowledge of the revocation is the same individuals that were present on June 10th that were receiving the benefit. So again, I don't think the overall substantial evidence here, there is a credibility determination which I don't believe is supported by the evidence required for such a credibility determination given the documentation and the individuals that were present that day. But the credibility determination is what it is. So Elkoff's testimony that wasn't discussed was credited, and despite the fact that he made a proposal that was double his previous proposal on hazard pay, and every single person at his table was receiving that benefit. So again, when you look at the record and you look at how this was specifically tied, I think the overwhelming evidence does do this. I think this is akin to when you all hire a clerk. When you hire a clerk, you do it for one year period. You know it's going to be a one-year period, and you know that at the end of that one-year period that they're going on to something else. You don't make a secondary decision to fire them at the end of their one-year period. It's just the conclusion and culmination of what you're doing. Now that instance may involve specific dates, and I can appreciate the distinction there. This was a very unique situation, and I think the employer took actions that were justified, which the board actually confirmed, and they were temporary actions designed to address immediate emergent circumstances. So they're definitely, I think, the cases suggest though that if it's an emergency, you can do it. No bargaining about it, but there has to be bargaining about the effects. Absolutely. Okay. I take it on the wage increase, your argument is there wouldn't really be an effect. I mean it goes into effect, it's done, there's nothing to negotiate about after that, is that right? That point was made exactly by the dissent. Okay, what about the non-certified aides or whatever? And that bargaining is in the record. If you look at the record, you see the parties began discussing the non-certified aides after the employer emailed the list to the union on June 11th, which was the day the last patient tested, or the last three patients tested negative. They emailed the list identifying those individuals to the union on June 11th. On August 4th, they began discussions over the non-certified aides. On the September proposal, the employer made a proposal confirming both the union's demands, that the certified aides would be trained quickly and that they would be listed in the collective bargaining agreement. The union's, ELCOF, the union's chief negotiator expressly confirmed they never asked for the non-certified aides to not be used or ever asked for any special scheduling because of the circumstances at hand. So I think the effects bargaining did occur and the record confirms as much. The board really rules against the employer on that issue because they argue that the employer did not bargain fast enough. And that's where our brief points out that they apply it, frankly they don't even apply their own standard. The board rules that the employer should have given notice as soon as bargaining was feasible and the need for immediate decision-making had passed, but then it rules that the employer violated the act because they didn't immediately notify the union upon making the two changes at issue. But negotiation about the aides, so in theory I take it that could have happened in June at this June 10th session? It could have, yes. I mean why isn't that enough on that particular? Part of the thing you have to take into consideration is the June 10th meeting was the first time the parties had met since November 2019. There was a lot of issues going on in a short period of time. There was first time they were meeting over Zoom versus with the mediator. They were separated for a large portion of that meeting. So some things did definitely slip through the cracks. I frankly at the time I didn't even know about the non-certified aides. I think that's in the record. But regardless the very next day there's no dispute and the ALJ credited and confirmed that the received notice via email on June 11th confirming the existence of the non-certified aides. Which again was when the emergency actually, the earliest point I think anyone can argue that the emergency in that facility ended, was when the existence of the COVID positive patients in that building ended. At that point prior to that, go ahead. Is there any part of this remedy that is specific to that issue? To the non-certified aides? Non-certified aides not bargaining soon enough? Yes. It's both the finding that the employer didn't bargain in good faith on the non-certified aid issue. The finding that the bargaining didn't occur over the original issue, the original decision. Part of the argument is the board changed the analysis here. They now require the... I understand that. But what's the practical consequence of that to you? The practical consequence of what they're asking for in the remedy would be a compliance proceeding doing what we should have done in this case. The ALJ said that we had to go through the payroll records and determine whether the testimony that no aid loss worked because of these non-certified aides was true. Even though those payroll records were in the record, a general counsel exhibit, that analysis was never applied. And in fact I believe confirms what the Cervi and Zinnei Drayton both testified about, which was that nobody lost out. But that would be between, and that would only be relevant from June. Let's say the day they say you should have bargained, sometime in June, up to August when you started talking about it? No, the board takes the position that that applies to the entire period that those aides were used, even though the parties actually did bargain, which is why the remedy and the bargaining obligations are so important here. And again, here, the board for the first time required an employer to bargain over the original decision, which is completely different than the case law prior to that point. They frame this wage increase and a later rescission as a separate decision, which frankly is not only inconsistent with the facts in the record, it's also inconsistent with their prior cases. I actually like, there's a quote from the ALJ, I apologize, I say it a lot of times. Can I ask a question about your last argument in your brief? I'm curious about the scope of this last argument. So I understand one of the remedies you're requesting is to re-send their re-institution of the $2 increase, but I think that would be dependent on the other four arguments. And the last argument is solely about the additional remedy, the language, where the employees are allowed to get direct or foreseeable damages? So yeah, and actually, no, the tribe remedy would apply to damages for any of the organizations, based on the board's analysis. And the argument, if you're reading the tribe decision, is that regardless of whether it was a direct damage, if there was damage somebody incurred that was likely foreseeable at the time, an employer could be liable. So how do you determine who the possible employees are that would fit this profile, who are entitled to prove any damages? How does that process work from here? According to the tribe, you'd have to look at the individuals that were working during the period with the non-certified aides, or who didn't receive, frankly, it'd be every employee, according to the board's position, it'd be every employee that worked at the facility since April, and who didn't receive the $2 an hour after June 16th. But is the, so that's what I guess, so is that, is it something more than the $2 an hour that this additional tribe remedy would? Yes, tribe says, for example, if somebody had to take a loan out of their 401k, the employer would be liable for the interest and fees. If they lost their house or had late fees on a credit card payment, that those damages would be foreseeable and that the employer could be liable. Tribe basically insinuates, which is what's prohibited by the Supreme Court and confirmed in Burke, which is the labor of the law doesn't provide consequential damages. The labor laws provide a make-all remedy that is back pay and potential injunctive relief. Anything behind that direct damage incurred, caused by the employer, is outside of the authority bestowed on the board. Thank you, counsel. May it please the court, Heather Beard on behalf of the National Labor Relations Board. Once Metro Man lawfully implemented a wage increase and a hiring plan for non-certified nursing assistants to address its staffing crisis from COVID in April of 2020, Metro Man failed to even tell its bargaining partner, the union, what it had done and why it had done it, let alone give it the requisite opportunity to bargain about it that was required under the law. Was it required to bargain about it initially, given that it was these exigent circumstances? Initially, no, you're correct, your honor. And the board found, excuse me, the board found that initially the very narrow exigency exception for emergencies to the duty to bargain applied. And that during those first couple tragic weeks at the end of March and beginning of April, that the exigent circumstances exception to bargaining did apply and therefore that the initial decision April 8th to increase the wages of those, there was a very severe staff shortage at that time, to come in, that decision as well as the unilateral implementation of hiring non-certified nursing aides as opposed to the standard aides, that was excused by the narrow emergency exception. And what the teaching the board found of its own precedent, which this court in Kindred does give significant, not in Chevron, but deference to, is the precedent that holds, and what the board held here, that the takeaway from its precedent is the duration of the problem caused by the emergency, the decision making that is caused by the emergency, gets to be truncated when there is this limited, when there is no immediate decision making to be made. And here the board found, looking to the emergency under these facts, once they did decide, Metro Man, we've got to get people back in the building, and they did it, they then were not licensed for months afterward to set their own benchmark as to when that would end, not speak to the union who represented its employees at all. Well I think the benchmark set was that it would end when COVID was out of the facility, isn't that what the decision was? The decision that was implemented was yes, that they would do that once COVID was out of the building, and that was the decision that the board was saying by the time... What does that have to be bargained over? Isn't that a factual issue that can be determined pretty easily without bargaining? What the board found here was that the decision to increase the wage was a separate decision from the end point of when that would be, and that the end point could have been something, there could have been bargains, especially in June when they sat down to bargain anyway and didn't tell them. I thought that the evidence is that the company said that they were instituting the increase until COVID was out of the facility. Well the finding was that the COO Dunn said that in a meeting that was sparsely attended by employees, and then the notice that went up. So it wasn't communicated clearly, the notice that went up then said until further notice, and then serving... So I got the until further notice notice, is there any other evidence in the record that would support the board's finding that it was a discretionary end date rather than an end date when the last COVID patient was out of the building, other than the until further notice sign that was... Sure, I think the evidence that the board was relying on is that Servi testified that she implemented what Dunn had initially intended, which was when the last... When there was no more COVID patients in the building, and that she went to Human Resources and communicated that decision, and the board found that although it could be looked at as one, as the dissent found, the board found it could be looked at as one decision, but that it was because it was done by Servi and communicated to Human Resources, it was better looked at and they found that it was two separate decisions, and that therefore what was happening is the need for immediate decision-making that undergirded the limited emergency exception was over by that time that the decision of the $2 and when there were no COVID patients in the building anymore? That's correct. So that was just happenstance? No. They made this one decision and they're like, oh we're gonna end it, and it just so happens that there are no more COVID? I mean they're clearly linked, aren't they? The board did not find that they were not linked, they said that albeit... But how is it a separate decision then if they're linked? I don't under... I mean it just seems like, yes, we're gonna do this, it's gonna end, we don't know the exact date because it's on a condition, but the condition happens and the facts show us that it ends. What's there to bargain about at that point? Right, I think the board, what the board looked to as a piece, as a fact of this, was that temporal quality of the conditional. So at the time of the emergency, when nobody sort of knows what's happening other than death and a lot of employees were scared and didn't come into work, we're gonna try to get folks in the building and the decision was made, we've got to increase now the amount of people, the amount of money that people are being paid in the CNAs. And as, once that decision was made, the decision as to the end point, keeping that the end point, was one that was, I think the board's language there was, ripe for bargaining, particularly with the union who represents the employees, to tell them, hey, guess what, if you want to earn some more money, we've got this incentive for you to come in. And secondly, this was something that the Metro Man had licensed the end point of something that was subject to an emergency exception, when the end point wasn't something that they were, they were able to, to take the exceptions, the benefit of that emergency exception. And I think what's important to remember here, is the board did view this as, what should be the limiting principle of an emergency exception? And it did look to its two cases that were its precedent, poor printing. So the limiting principle, it seems to me, isn't it that you have to bargain about the effects? Well, that's what. The inevitable results, or whatever it is. So, are you saying that there's another, there's something else in between there? There's the emergency, we have to bar, we don't have to bargain about, or maybe we do, we do have to bargain about the emergency at some point, and the effects? No, let me try to bargain over the decision, or the effects, at the time of the emergency. And so what, what, what effects bargaining versus decisional bargaining is, if you give me two seconds to just explain that. Decisional bargaining is, let's say there's a, we're going to lay you off because of, for whatever reason, we don't have to bargain over that, but we do have to bargain over recall rights, and how are we going to do this layoff? That's sort of the classic decisional versus effects bargaining. And here, what the board found, consistent with its precedent, is that the emergency exception excused both the decision and effects of, at the time, at the imminent threat, when the staff was not coming in at the end of March, beginning of April, that decision to increase wages decision, and the effects right then and there, that was excused by the emergency exception, and the decision to hire the non-certified aides. However, once the need, and this is the key takeaway from the port printing case, once the need for the immediate decision making occasioned by the emergency was over, then the duty to bargain, reattached, duty to bargain over both, the board was reading its precedent, both the decision that's made when there's no immediate need for the decision making, and the effects. So here, once they had instituted the wage increase, and employees are earning it, and they were able to take care of bringing folks in, the record shows that the staff did come back by May, but the employer, for no reason that I can discern, did not inform the union until way after the staffing crisis that was occasioned by the emergency had ended. And the board here is simply finding, in order for there to be a duty to bargain in here, I mean, I don't think it can be lost that in June, as they're sitting and bargaining, it was June 10th they started, June 16th was when the Metro Man took away the wage increase, on June 16th, when they're in the middle of trying to have this bargaining. So at all different points, what Metro Man was not doing is involving its bargaining partner in trying to figure out the best... Can I ask you, I think that was helpful to me to clarify, that I believe the board takes the position that once the emergency has subsided, the duty is to bargain, not only of the effects of the earlier emergency decision, but also over the emergency decision itself. So this is, after the emergency has passed, you have to retroactively bargain about the earlier decision. That would be in this particular case, I'm not, I don't believe this case was a change, I mean, I know one of the... That's what I, I don't, that's why, isn't this a legal question about the scope, about the scope of the statutory duty to bargain in good faith? And... Yeah, the two... And so, and so, and but you don't think it's an expansion of the board's precedent? I thought the board's precedent was you just, in your layoff hypothetical, you have to bargain over recall rights, and that's the effects. But now it seems the board has taken the position, not only of the effects, but the original decision. Sure, in port printing, there was a hurricane, and there was a layoff, so maybe that would, and that's one of the cases the board's talking about here. And what, in that case, there was only an effects bargaining obligation about the layoff after, and the governor was like, there's an evacuation, everybody's got to leave, so employees couldn't come to work. Why couldn't they bargain, why couldn't they bargain over the layoffs after the hurricane had passed? Right, I'm not sure, but my way that the, to reconcile the board's takeaway from port printing being that the important pieces, the emergency and how it is cabined, is that with the hurricane, the employees had all, had been, it had already passed and was done, they didn't come in, there was an evacuation, there was nowhere to go, they saved the lives, they didn't, they didn't go into work. In this case, with this emergency, the board is saying, look, we cannot expand the limited emergency exception to a series of decisions, because that could open up or eviscerate the whole exception. But in this case, the need for immediate decision-making, you know, in port printing it was the hurricane, in this particular case, it was we've got to get people back. And once the people got back, the board was saying, you know, the takeaway from our cases isn't that we have this line, it only affects bargaining, and, you know, there's a stark difference between that and decisional bargaining. It was, once the need for immediate decision-making is over and you're still having, you know, not the emergency, but you still have issues coming from COVID, the bargaining obligation that the board has found in its own precedent is the one that it applied in this case. Can I ask you also, just to clarify, that was helpful, and then, it was the decision solely about the original decision, the board's decision, that is, was the board's decision solely about the company's original decision, or did the board also find effects in this case? Because it's not clear to me what the effects are. Right, when the board says you must have bargained over, again, not the original early April decision, that was fine, when the board says sort of the, I think of it personally as there was the wage increase and then the continued wage increase. So with the continued wage increase that there needs to be bargaining over, when the board says bargain over that, they don't necessarily also say, and the effects, everything. And in this case, it was hard. I was thinking this is all for our compliance bifurcated proceeding, in terms of a remedy, but, you know, the effect of a wage increase, in terms of what does that really mean, you know, you give me a $2 increase, that's the decision, and the effect of the $2 increase, is it the same, is it, you know, for all intents and purposes, in this case, is it the same, and maybe in a different case, it wouldn't be the same. I mean, should it be about how they structure the incentive payment? Because you can, technically, you could have structured it in ways that could have made it quite clear that it was a unilateral decision. So if you gave, if you said to employees, we're going to give you a one-time bonus of this amount of money, if you agree to come back for the next two months, that would have been, I think, a unilateral decision, and the bonus would have been paid out. What would the board's, taking the board's precedent in this case, how would it have applied? Would it have said, you have a duty to bargain over that original decision, once you, once the emergency has subsided and employees have come back, or would it have said, that's a unilateral decision, it's good, you're fine under the emergency exception? Sure, without me being able to bind the board, I would say the key difference in your hypothetical there was that there was clearer notice as to what was going on in that circumstance, and here, in this case, the board was saying, look, Metro Man was not licensed to not only set an unclear benchmark that it didn't clearly communicate to the, to the employees, let alone, it had the duty to communicate it, not just to the employees, but to, to the union, that in this circumstance, looking at Port Pruning and Kankakee, our own precedent, the takeaway is the need for immediate decision-making was over in this case, it was over by May, and there should have been bargaining over both the decision post its implementation in the early incipient days of the pandemic, and later, and so I think, I think the board will look at it that way. This isn't an expanded, you know, the board, this was not expanded, as the board said, this is our takeaway, key takeaway from our precedent, and I would also point out, as we said in our brief, this... What, what, what is the precedent on the original decision in an emergency situation that you went back and bargained about? It's not Port Pruning, and it's not the other one, right? Kankakee, meaning, I think you, what, what you might be asking me, your honor, is you didn't, Metro Man does not ever have to go back to April 8th and, and justify, we raised wages and hired people on April 8th. That one decision that the board found, there's no bargaining over, over that at all. It's the, once we implemented that decision, we did it, but what the board is finding from its precedent is that the obligation is the continued, you know, wage increase past then, and then the decrease. So continued wage increase, okay, ongoing, is that an effect, or you're saying that's part of the original decision? I'm saying that's, it's not an, I suppose a lot of it's nomenclature. I'm saying it's, it is for sure a decision to continue the initial wage increase. Okay, and what is the precedent on that? The precedent on this, this, this particular case is the precedent, is, is, this is what the board has found from what... This particular case. Yeah, Metro Man, right. That's what it took away from... No, the board is expanding its power in this case, beyond where it had gone before. I guess I'd respectfully rephrase what your honor said, if I may, which is the board isn't expanding its rule, it's interpreting its rule on a different set of facts, which has perhaps a broader implication, perhaps. Okay. Can I ask, I see your light is on, but I do, I did want to talk about the remedy a little bit. So what has been the board's traditional practice on the type of damages that can be provided? So back pay, obviously, is mentioned in the statute. When I think about remedies, I think about the common law, and I think compensatory damages are the traditional remedy and tort. Has the, is, is, has the board's traditional understanding that the make whole relief includes all sort, sorts of compensatory damages, or is what they have done here something that is just different than what they have said before? Sure. Well, the way that the board phrased it, I can't really say it any better, is that what they did in Thrive was clarify the board's make whole remedy as having and adding an express requirement, by adding an express requirement, that a respondent make the injured party whole for all direct or foreseeable pecuniary harms as a result of the unfair labor practice. And in our brief, we show that the board has been doing this for years, but it's just been doing it in individual cases with various different damages that aren't directly back pay, but that are direct or foreseeable harms. And so this, this, we also, I, I would be remiss if I didn't point out that it is the board's position that that issue is not before this court, because it was not raised. Yeah, setting aside the exhaustion. Sure. I'm just curious. So, like, Title VII was originally modeled after the NLRA, and I thought the traditional understanding was the relief was quite limited in Title VII. Sure. And that's why the Civil Rights Act of 1991 allowed for compensatory damages, including, like, emotional harm from discrimination. Right. And. So would that type of, has that, has it been the board's understanding that that type of relief was actually available all along under? No. I can quickly answer it by saying no, which is that, that what the board said and what it did here was not go into the realm of what in other areas, such as in tort called consequential and in the realm of Title VII and things called compensatory emotional, emotional stress. That's not what the board understands it can do. That isn't what the board is doing. And so in this case, I believe my opponent raised the Burke case, those kinds of damages were not the kinds of damages the board does not understand. It's going, for example, to award, you know, the kinds of damages that came after 1991 in Title VII and amended it. I'd also point out that although Title VII was based on the National Labor Relations Act, the, the, eventually Title VII was amended and the reasons for Title VII and what, why it was based on the National Labor Relations Act don't necessarily continue on after 1991 in the same sorts of, after those amendments. So I would say looking back, Title VII doesn't, any of the reasoning into why Title VII was framed and written the way it was, don't preclude the board from doing something that might be precluded under that statute, but also the board is not taking the position that it's doing something Title VII-ish, if that makes sense. Let's hit a couple quick points for you. I think one of the big key points to emphasize following the board's argument is that the board asserts that the bargaining obligation, the obligation to notify, occurs when the need for immediate decision-making passes. And bargaining is feasible. It's really a two-part test. Has the need for immediate decision-making passed and is bargaining feasible? They never answer that question here. To them, it wasn't in their name. According to the board's ruling, what they held was the employer violated the act when it did not immediately notify the union about its actions, putting in the $2 an hour hazard pay and using non-certified aids. There is no facts supporting the basis that bargaining was feasible. In fact, the state of Michigan remained shut down. The facility itself remained shut down. Parties had an incredible difficult time getting any discussions going on, which is evidenced by the fact that we met briefly on June 10th, weren't able to meet again until August 4th, and the union canceled our June 11th bargaining session. But I would argue, and I think this board should... Can you just send an email that says, hey, by the way, we increased the pay of $2 an hour so there's no COVID patients, and we hired, pursuant to the federal government's recommendation or waiver, we've now hired some non-certified aids. And that's... Happy to discuss at our next session. And that seems like a really great, easy response. And I would encourage you to review Ms. Servi's testimony about why she was not able to send an email. Ms. Servi confirmed she couldn't even talk to me. I confirmed it. The ALJ didn't credit it. But when you're spending 12 hours a day trying to get people to pick up dead bodies, and you're going to 7-Eleven to get bags of ice, you don't have a lot of time on your hands. When people are sleeping in your building because they can't go home and see their families... By June, it was well known through the building. Everybody was receiving it. The presumption was they already knew. And when we met on June, there's testimony, although not credited, that the union was specifically challenged why they doubled their offer. And the response was that they doubled their offer because you're already giving them $2 an hour. Now, that wasn't credited. I think the documentation and the circumstances involved don't support that credibility determination, but that's what it is. So I understand and appreciate the concerns about not an express statement of informing them on June. There is evidence that that did happen on June, and there is evidence that even if it didn't specifically happen, they should have been well aware. And the board's precedent confirms that the knowledge of the bargaining team members is impugned upon the union itself. And they didn't follow that here. Here, there's no finding of when the emergency even lasts. In fact, opposing counsel just points out that the emergency, that staff didn't even start coming back until late May. But according to the board, the violation occurred because they didn't immediately notify the union in March. The building had an imminent threat to life. They had COVID positive patients in the building around other patients with conditions that put them at risk of immediate death. That didn't end until June 11th when they got the three negative tests back that evening, and they posted the notice on June 12th confirming there were no more positive patients. The building was shut down for months. They extended that deadline in September. When was bargaining feasible? That's questionable, and not any facts in this record confirming that it was feasible in April like the board holds. There is no evidence that the emergency subsided in April like the board holds. In fact, all the evidence indicates to the contrary. I apologize, I'm running over my time again. Okay, thank you counsel. We'll take the matter under submission. Thank you, John.